# EXHIBIT E

**FRANCIS ALEXANDER, LLC**
Francis Malofiy, Esquire
Attorney ID No.: 208494
Alfred J. (AJ) Fluehr, Esquire
Attorney ID No. 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*Law Firm / Lawyer for Plaintiffs*



*Filed and Attested by the Office of Judicial Records 09 SEP 2022 01:12 am E. HAURIN*

## THE COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| MICHAEL TUR;<br>ANN MARIE TUR;<br>HENRY P. TUR, JR.;<br>ALINE BYRNES,<br>*Plaintiffs*<br><br>V.<br><br>LARA SABANOSH;<br>MORGAN JAMES PUBLISHING, LLC;<br>AMY RIPP COYNE,<br>*Defendants* | CIVIL ACTION NO.:<br>220500433<br><br>MAY. TERM, 2022<br><br>*JURY TRIAL DEMANDED*<br><br>CAUSES OF ACTION:<br>I.   Libel<br>II.  Invasion of Privacy False Light<br>III. Invasion of Privacy Intrusion Upon Seclusion<br>IV.  Invasion of Privacy Public Disclosure of Private Facts<br>*V.*  Intentional Infliction of Emotional Distress |

## CIVIL ACTION

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service
1101 Market Street, 11th Floor
Philadelphia, Pennsylvania 19107
(215) 238-1701

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificatión. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACIÓN DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107
(215) 238-1701

Case ID: 220500433

FRANCIS ALEXANDER, LLC
Francis Malofiy, Esquire
Attorney ID No.: 208494
Alfred J. (AJ) Fluehr, Esquire
Attorney ID No. 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*Law Firm / Lawyer for Plaintiffs*

THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| MICHAEL TUR;<br>ANN MARIE TUR;<br>HENRY P. TUR, JR.;<br>ALINE BYRNES,<br>　　　*Plaintiffs*<br><br>　　　　　V.<br><br>LARA SABANOSH;<br>MORGAN JAMES PUBLISHING, LLC;<br>AMY RIPP COYNE,<br>　　　*Defendants* | CIVIL ACTION NO.:<br>220500433<br><br>MAY. TERM, 2022<br><br>*JURY TRIAL DEMANDED*<br><br>CAUSES OF ACTION:<br>I.　Libel<br>II.　Invasion of Privacy False Light<br>III.　Invasion of Privacy Intrusion Upon Seclusion<br>IV.　Invasion of Privacy Public Disclosure of Private Facts<br>*V.*　Intentional Infliction of Emotional Distress |

# COMPLAINT

1.　　　This is a defamation and invasion of privacy action related to the killing of former

marine Christopher Tur, who was working as a civilian at Naval Station Guantanamo Bay in

2015. Tur is originally from suburban Philadelphia, as is his family, the Plaintiffs in this action.

2.　　　Defendant Lara Sabanosh was married to Tur, and engaged in an illicit affair with

the commander of the Guantanamo Bay military base, John Nettleton, in 2014 and 2015. Tur

found out about the affair because Nettleton and Sabanosh flaunted the affair at a party in front of Tur and their friends and colleagues. Tur was outraged and humiliated in front of everyone he knew. Tur then confronted the commander at his house that night, but then disappeared. Tur's body was discovered several days later floating in the Bay, with injuries to his skull and ribs. Nettleton repeatedly lied to investigators about Tur's whereabouts the night he died, as he destroyed physical and electronic evidence.

3.    A great deal of Tur's blood was later forensically found all over Nettleton's house which Nettleton had attempted to surreptitiously clean. It is believed Nettleton attacked Tur knocking him unconscious and then dumped his body in the water causing him to drown.

4.    Investigators later found a bloody paper towel near Nettleton's dock, and studies of the water currents showed that his dock was a probable dumping ground for Tur's body.

5.    During the search for Tur, Sabanosh repeatedly indicated that she was unconcerned about Tur's whereabouts, and also made comments which suggested she knew he was dead. She also conspired with Nettleton to hide the confrontation at Nettleton's house, and her affair, from law enforcement long after she knew Tur was dead.

6.    Nettleton's destruction of evidence helped him escape murder charges, but he was convicted of obstruction of justice and related crimes in 2020.

7.    Since then, Sabanosh has attempted to hijack the Me Too movement and profit off her husband's death—which she played a major role in causing.

8.    Specifically, she has written a book making the false claim that she was the victim of domestic abuse, absurdly and outrageously attempting to profit off the death of her husband. She has given many interviews to promote the book.

Case ID: 220500433

9.      In this false and malicious version of reality, Sabanosh is the victim and it was Tur getting in the way of her and John Nettleton's love. The book is filled with outright falsehoods, distortions, and reveals Sabanosh as a habitual liar and serial fabulist.

10.     Sabanosh did not restrict her false and malicious attacks to Christopher Tur, who is no longer alive to defend himself. In her book and interviews she outrageously and falsely attacks Tur's family—the Plaintiffs—throughout the entire book, who knew her well and treated her as one of their own for many years.

11.     It is the malicious lies and disclosures that Sabanosh tells about Tur's family which forms the basis for this action.

12.     Sabanosh has created a false reality where she is the victim—in fact she is morally bankrupt and reviled—so that Sabanosh can profit off her lover killing her husband, while also maliciously attacking her husband's family.

## Background

13.     Tur lived at Naval Station Guantanamo Bay with his wife defendant Lara Sabanosh (then known as Lara Tur) and their two teenage daughters in 2014-2015.

14.     Unknown to Tur, Sabanosh was having an affair with the married commander of the base, John Nettleton. An affair is a scandalous matter as a norm, but an affair (a criminal offense in the military) with the commander of one of the most sensitive bases in the US military is an explosive revelation.

15.     While at a party at the officer's club called the Bayview on January 9, 2015—where Tur, Sabanosh, and many of their friends and high-ranking officers were present—

Case ID: 220500433

Sabanosh and Nettleton drunkenly decided that they were going to stop hiding the affair. By multiple accounts at the party they were physically intimate and it was extremely inappropriate.

16.     Tur, becoming aware of the situation, was understandably extremely angry. As the party broke up and Nettleton tried to convince the partygoers and Sabanosh to come back to his house to continue the revelry, Tur confronted him and Sabanosh outside the club.

17.     A heated argument broke out with a crowd watching. Tur and Sabanosh's marriage had been rocky for some time, but he did not know why. Hidden from him was that Sabanosh had secretly been obsessed with Nettleton and carrying on with him.

18.     The executive officer broke up the argument, but tensions were high. Sabanosh told Tur "I hope you die." She then left to sleep at a friend of the couple's house (Kelly Wirfel), Nettleton went home, and Tur left for his house.

19.     Tur, however, reversed course and confronted Nettleton at his house furious and humiliated that he had been betrayed in this way.

20.     Tur called Kelly Wirfel that night and told her that he had just punched the "skipper." Nettleton could be heard in the background. Wirfel at first thought it was a joke and the call ended.

21.     When Wirfel did not hear anything for several hours from Chris Tur, she set out early in the morning of January 10, 2015, to search for him with a colleague named Randy Barger. She asked Nettleton if he knew where Tur was and he denied any knowledge; however, Nettleton refused to allow Wirfel to search the house or his property for Tur.

22.     Unknown to Wirfel and anyone else at the time, Nettleton is believed to have seriously injured Tur at his house and had been furiously cleaning the scene of the crime.

Case ID: 220500433

Searches later found Tur's blood all over Nettleton's home and a bloody paper towel under Nettleton's dock.

23.     A massive search took place and it quickly became apparent that Tur was not on the base. Nettleton actively lied about Tur's whereabouts the night he disappeared, falsely claiming the last time he saw Tur was at the Bayview, and suspiciously refused to authorize helicopter searches. As a former rescue pilot, Nettleton knew the fastest way to find someone, especially in the water, was from the air; he did not want the body found.

24.     Tur's body was eventually found floating in the water on January 11, 2015, just yards from the Cuban border. The delay had caused the decomposition process to begin; however, it could be discerned that he had suffered multiple broken ribs and had a severe laceration about an eye.

25.     In addition, although he was badly injured, when he was placed in the water he was still alive; the cause of death was drowning.

26.     It is believed that Sabanosh and Nettleton communicated on January 10, 2015, before and after Tur was reported missing, and that Sabanosh was aware or suspected her husband was dead and that Nettleton (her lover) was involved.

27.     At a meeting at 1 pm on January 10, 2015, with Wirfel, Barger, Sabanosh, and Nettleton about where Chris could be, Sabanosh's attitude was extremely suspicious. She was "nonchalant" and commented "I hope we never find him."

28.     The land on the Guantanamo Base is relatively small and easily searched. The comment only makes sense if Tur was in the ocean. Sabanosh's comment demonstrates knowledge that Tur was dead and his body was in the sea.

Case ID: 220500433

29.     Sabanosh never disclosed during the search or later in the investigation the affair or that there had been a fight the night at Nettleton's house that night with Chris Tur (she was aware of the phone call to Kelly Wirfel).

30.     She also suggested during the search that Tur was suicidal, again demonstrating knowledge that Tur was dead and not just sleeping off a hangover. When Plaintiffs Michael and Henry Tur, Tur's brothers, visited the base several days after Tur's body was found, Sabanosh also told them that he probably committed suicide. She always knew that the fight at Nettleton's unequivocally did not point to suicide.

31.     She later admitted at Nettleton's criminal trial that Tur was in fact not suicidal, causing the jaws of everyone present to hit the floor, a stunning reversal.

32.     In addition to claiming that Christopher was suicidal, she claimed he would steal her medication, tried to control her, had probably overdosed, and was an all-around awful person. This was prior to her affair with Nettleton being revealed on or around January 21, 2015.

33.     Very plainly in hindsight, Sabanosh was already lying and spinning and trying to paint herself as the victim. Plaintiffs were taken aback by this description of their brother which bore no relation to the man they knew.

34.     Bizarrely, although Michael and Henry arrived days after Tur's body was found, when they walked into the house Michael saw an empty pill bottle of Chris Tur's medication was placed in the middle of the bedroom walkway leading to the bathroom. Sabanosh then falsely claimed that Chris had likely overdosed. In hindsight, it is apparent that Sabanosh had placed the bottle there before their arrival as a prop, as an empty bottle would not have sat in the middle of a walkway for several days without being moved.

Case ID: 220500433

35.     Over the next several days, from January 10 to January 20, 2015, Nettleton destroyed evidence, aided and abetted by Sabanosh and her silence.

36.     Sabanosh was interviewed by NCIS on January 16, 2015, and again denied any affair. She later took the Fifth Amendment when asked about this before a grand jury. After lying to NCIS, Sabanosh and Nettleton colluded and agreed to keep hiding the relationship (and motive) from law enforcement.

37.     On January 20, 2015, Nettleton was informed by NCIS that he was being investigated for adultery and involvement in Tur's death. He immediately invoked the Fifth Amendment.

38.     Over the next two years, Nettleton and Sabanosh repeatedly communicated and agreed to hide the affair, to the point where Sabanosh agreed to refuse to appear to testify against him. This occurred even after Sabanosh knew that Nettleton was involved in Tur's death. Sabanosh was obsessed with Nettleton and believed, even after her husband had been killed, that Nettleton and her would end up together.

39.     In or around January 19, 2015, Plaintiffs, who considered Sabanosh to be close family, brought her and the couple's two daughters to Pennsylvania to stay in Michael Tur's home as the family tried to cope with this tragedy. Sabanosh's parents were also present. Plaintiffs opened their home to Sabanosh and her family.

40.     Sabanosh was at their house when, on January 21, 2015, national news organizations began reporting that Nettleton was fired as commander of Guantanamo and that he had been having an affair with Sabanosh.

Case ID: 220500433

41.     It is impossible to convey the shock this caused to Plaintiffs, finding out about this information from news networks. Sabanosh had hidden it from them. Indeed, even Sabanosh's own children were stunned and furious. Sabanosh's conduct and cover up shattered the family.

42.     Shortly after the news broke, Nettleton had his daughter message Sabanosh's daughter, asking Sabanosh to call him on a burner phone. They spoke for over an hour, with Sabanosh covering her mouth. It is now believed that they were conspiring how to make their stories consistent and cover up what happened.

43.     When Sabanosh was asked about the phone call by Plaintiffs she claimed that Nettleton was checking on her and that he told her that when the dust settled, they would be together. This was bizarre and a highly offensive thing to say to the Tur family. She even told Michael Tur that her and Nettleton had decided the night of January 9, 2015, "Fuck it. We aren't hiding our relationship anymore." Michael could not believe what he was hearing or that she expected sympathy for such a cruel and callous harm she caused to Chris and her family.

44.     She hid from Plaintiffs there was a physical altercation between Nettleton and Tur immediately before his death.

45.     Sabanosh then outrageously and shameless began trashing Christopher in front of the Tur family to justify her affair; it was extremely bizarre in light of the national news revelations and that her husband was dead. Sabanosh absurdly wanted Plaintiffs to take her side.

46.     At that point, and over the next several years Sabanosh publicly disseminated false and outrageous statements about Christopher Tur, including allegations that he beat her, illegally took her medication, was seriously mentally ill and suicidal, was an all-around awful person, and that Christopher Tur was at fault for what had happened to him. As noted, she lied and denied

having an affair, as she had done to NCIS. This was all done in an effort to point the finger away from her and Nettleton.

47.    Nettleton was put on trial for obstruction in 2020. Sabanosh was one of the witnesses. Sabanosh casually admitted under oath that Christopher Tur had no history of suicidal thoughts, had never attempted suicide, and that she did not seriously think he was suicidal. This stunned Plaintiffs, as it contradicted everything that had been said since Christopher Tur died.

48.    Plaintiffs had sat silent for years being told that Christopher Tur was a different person than they knew, and that he wanted to kill himself. The trial revealed that none of this was true.

49.    As Sabanosh left the criminal trial in January 2020, she gave Plaintiffs the finger in the courtroom demonstrating her malice for Plaintiffs and that she has a personal hatred for them.

50.    The indictment and trial revealed that Lara Sabanosh is not credible, that she invented lies about Chris Tur to direct attention away from her affair which had led to her husband's death, and that she has no compunction about acting in an extreme, outrageous , and dishonest manner to avoid responsibility for her actions.

## Defendants Publish an Outrageous and Malicious Book

51.    In 2021, Plaintiffs became aware that defendant Sabanosh was writing a book, named "Caged: The True Story of Abuse Betrayal, and GTMO."

52.    Excerpts of the book were e-published on May 4, 2021, and additional material was released throughout the year. The full book was published on November 30, 2021, both electronically and in a paper version. At some later point, audio versions were also recorded.

Case ID: 220500433

53.     The book was published by Defendant Morgan James Publishing, and the afterword indicates that Sabanosh's best friend and witness to much of the described conduct, defendant Amy Ripp Coyne, participated in the drafting and editing of the book. Ripp Coyne has also participated in promoting the book on social media.

54.     The book is an attempt to hijack the Me Too movement by Sabanosh and profit off her affair and husband's death at the hands of her adulterous lover.

55.     The book is full of malicious lies and paints an alternate reality which has no basis in the truth. In Sabanosh's telling she did nothing wrong, Chris Tur deserved to die, and she and Nettleton were victims. She wrote many horrible lies about Chris Tur, including falsely accusing him of domestic abuse.

56.     Tur, of course, is not here to defend himself or sue Sabanosh. Chris Tur adored his wife and kids, and his last moments were spent in anger and confusion over the how thoroughly he had been betrayed.

57.     As this Complaint describes, the book squarely takes aim at Plaintiffs, the Tur Family, creating vicious lies to make them appear petty, vindictive, mean spirited, and all around awful people.

58.     It also purports to disclose incredibly private information and moments—many heavily distorted—which Defendants had no right to publicly expose to the world.

## Defendant Sabanosh is a Habitual Liar who Has No Credibility; She Committed Academic Fraud, Falsely Claiming to Have Two Doctoral Degrees where She Has None

59.     In any defamation action credibility is important. It is therefore highly relevant that Sabanosh has no credibility and is a habitual liar.

60.     Of note, she has brazenly and fraudulently lied about her education credentials including committing blatant academic fraud when promoting the defamatory book in question.

Case ID: 220500433

61.     In her publicity campaign for the book, she has repeatedly disseminated a biography to Amazon, Apple, and many other websites and sources which falsely claims that she "complet[ed] two doctoral degrees" to give weight, credibility, and veracity to her book.

62.     She also gave written and verbal interviews where she claims to have two doctoral degrees.     See     https://www.audible.com/pd/Caged-Lara-Sabanosh-Podcast/B09VY8VTLL; https://www.brilliantread.com/interview-with-lara-sabanosh-author-of-caged-a-true-story-of-abuse-and-betrayal-at-guantanamo-bay-and-what-comes-afterwards/;     https://www.davepamah.com/author-interview-caged-with-lara-sabanosh/;   https://people.marketinginasia.com/author-interview-caged-with-lara-sabanosh;;     https://usawire.com/why-the-game-of-perception-is-a-losing-game-for-domestic-violence/amp/?fbclid=IwAR10SdPs2SCLkt2gkQz70_RGSg7A_HXgwIW-XMcNjFldsuYnBMbLmJnSyK0

63.     The book itself also claims and/or implies that she has doctoral degrees on page 122.

64.     In fact, Sabanosh has no doctoral degrees whatsoever and was lying about her academic accomplishments to make her and her book seem more authoritative and credible. Defendant Amy Ripp Coyne knew these claims were false.

65.     Nowhere has Sabanosh told the websites to whom she gave the blatantly false academic information to change or correct the false information.

66.     Her dishonesty is not limited to academic fraud. She admittedly lied to law enforcement to hide her affair with Nettleton, colluded with Nettleton to hinder the search for Tur's body, colluded with him for years to cover up the motive for Tur's killing, she falsely claimed Tur was addicted to drugs and overdosed, and admitted to falsely claiming for years that Tur was suicidal.

67.     The book's content also (inadvertently) demonstrates that Sabanosh has no compunction lying even about events witnessed by many others. For instance, her description of the argument at the

Case ID: 220500433

Bayview following her and Nettleton's public display of intimacy on January 8m, 2015, which preceded Tur's killing, is divorced from objective reality.

68.     Her book describes her thought process the day after the argument on January 9, 2015, before Tur was reported missing: "Last night, he made a fool of himself. Everyone on base likely knows about his tirade." Caged, at p.132. Sabanosh's book entirely omits her and Nettleton's public profession of love that night and the many witnesses who saw that the two had made it unequivocally clear they were engaged in a physical, romantic relationship in front of her husband, Christopher Tur. Sabanosh not only ignores the justifiableness of the outrage expressed by Tur, but demonstrates a total lack of self-awareness that it was her and Nettleton's conduct that shocked all present.

69.     Sabanosh then describes a meeting between her, Nettleton, Kelly Wirfel, and Randy Barger later on January 10, 2015, to figure out where Christopher might be. She claims that she complained about Christopher's behavior and then told the assembled group that she wanted to file domestic violence charges against Christopher. She goes on to say that she was furious that Christopher had "made our private situation public."

70.     Again, this false recasting of the prior night to completely omit her and Nettleton's scandalous roles in this sordid affair defies belief. In a case of psychological projection she writes that she thought that Christopher Tur was hiding trying to figure out "how to manage his situation and his reputation to make himself look better" ignoring that it was her and the commander of the naval base who had all but admitted to an illegal affair in front of the base's entire command structure and were now colluding to hide it.

71.     There is a vast gulf between the objective facts and the way in which the book dishonestly presents her role and attacks others.

72.     Her fraudulent behavior and lack of credibility is directly relevant to the defamatory lies she tells about Plaintiffs in her book.

Case ID: 220500433

## Defendant's Defamatory Lies about Plaintiffs, and Invasion of Privacy

73.     In Sabanosh's zeal to attempt to use her husband's killing for profit, she not only attacked his good name, but outrageously attacked his family (the Plaintiffs) whom she had also betrayed. It is these false and defamatory attacks which are the subject of this lawsuit, as well as her inexcusable breaches of their privacy rights.

74.     It is utterly despicable to attack a dead man who cannot defend himself, prolonging the grieving of his family, and then take aim at them personally. The book is a prolonged and sustained attack on the Tur family, comprised of lie after lie after lie.

75.     The lies in the book about Plaintiffs are almost too numerous to account for, and are aimed at creating a picture that Plaintiffs and Chris Tur were and are horrible people.

**Defamation of the Tur Family Regarding Sabanosh and Tur's Early Relationship**

76.     At the beginning of the book Sabanosh tries to establish that Plaintiffs and Chris Tur are bad people by recounting alleged incidents she observed during the beginning of her relationship and marriage to Chris.

77.     For instance, in the Second Chapter she claims that while Tur and her were dating Plaintiffs[1] had teased Chris at a family vacation in Hilton Head, and that Chris had then angrily stood up and said "fuck," and then disappeared for hours. Sabanosh claims that his mother plaintiff Ann Marie Tur "laughed," "and one of his brothers turned to me and said, 'Welcome to the Addams Family,' smirking as if the family secret was now out."

78.     Sabanosh then wrote that while Chris had allegedly disappeared that "no one [Plaintiffs] seemed to care. No one asked about him or made any effort find him." She continued "Even after Chris finally returned hours later, everyone acted as if nothing had happened. I expected apologies or at least some discussion about what had happened. But there was nothing. It was then I learned this chiding and

---

[1] Plaintiff Byrnes was not present.

Case ID: 220500433

picking on people was normal, even acceptable, in his family, and I didn't like it. It seemed to me there was a broad lack of respect for each other."

79.     Every part of the foregoing is a defamatory fabrication and never happened. Sabanosh is maliciously and manipulatively trying to establish that Tur had a pattern of disappearing and that Plaintiffs made excuses for this behavior and ignored and enabled it. There was no argument, Tur never stormed off or disappeared after being teased while in Hilton Head, Plaintiff Ann Marie Tur never laughed about it, neither Michael nor Hank ever made any reference to the Addams Family, and no Plaintiff ever minimized or excused conduct by Chris Tur that never happened in the first place.

80.     Also in the Second Chapter, Sabanosh claims that Tur did not like his sister, Plaintiff Aline Byrnes.[2] To support this, Sabanosh claims that when she first met Aline Byrnes, Aline burped in Sabanosh's face. This incident never occurred, is fabricated, and is defamatory.

81.     Sabanosh also tries to paint the Plaintiffs as horrible in-laws; specifically, Sabanosh's parents threw her a graduation party to celebrate her graduating college. The book claims "Chris's family refused to attend. It was their way of punishing me for refusing to apologize to Aline for [an] argument we had while on vacation."[3] This accusation is fabricated and defamatory, attempting to paint the Tur family as petty and vindictive. In fact, plaintiff Michael Tur and his wife Pam attended the graduation party, as did plaintiff Hank Tur and his wife Sandy; both couples' children also attended.

82.     The party was at Chris and Lara's house in Hellertown, PA. Sandy had just gotten a haircut and Lara complimented her on it. Sandy and Pam sat at the kitchen table with Lara's mother and Lara; veggie dip was being served. It is bizarre for Sabanosh to claim that Plaintiffs were not there.

---

[2] Aline and Chris were close, but Aline and Sabanosh did not like each other, leading to less interaction.
[3] The referenced argument, described in the book, is another instance of Sabanosh and the book disclosing private facts about Plaintiffs and intruding on their seclusion.

Case ID: 220500433

83. Sabanosh also tries to paint the Plaintiffs as having rampant money and financial troubles. Sabanosh wrote: "Nearly every Tur family member wrestled (wrestles) with money and other financial strongholds." Caged, at p.44. This is simply false and defamatory. The Turs are fine financially.

84. To the extent any Tur had any financial struggles, such disclosure by Defendants of such a private fact is improper and unjustifiable.

85. In fact, the Tur family was asked by Chris and Lara for money to help pay bills, which they freely gave. The Turs never asked for the money back. Simply put, Sabanosh loved designer handbags, fancy shoes, and eating out and was spending over the couple's limits. This is not uncommon for young couples, nor is it the end of the world; but for Sabanosh to publicly impugn the Turs' finances when they helped her pay her bills is outrageous.

86. Ann Marie and her husband Henry also bought Chris and Lara nice furniture sets from Gamburg's Furniture in Hatboro, PA. They were happy to do so.

87. Sabanosh's book further claims that Ann Marie Tur "voiced confusion about why her sons were doting on him on his deathbed when Henry was never there for them while they were growing up."

88. This is false and defamatory on multiple levels. Ann Marie Turie never told Sabanosh this. It is outrageous to say that this occurred when it did not.

89. Furthermore, the claim and implication that the "brothers," Michael and Hank, did not like their father and only "doted" on him when he was on his deathbed is false. This was a close family who always did many things together.

90. When Henry was dying, he specifically asked that his family be around him.

91. The false implication Sabanosh wants the reader to draw, especially in connection with the aforementioned assertions that the family had money problems, was that the family and brothers were

Case ID: 220500433

only paying attention to their father because of an inheritance. This is completely outrageous, false, and defamatory.

92.     Even if the foregoing did occur or was true, it is utterly despicable for Defendants to publicly disclose such a private confession. Indeed, the book on repeated occasions purports to (inaccurately) describe the private discussions of the Tur family regarding inheritance and the death of Henry, Sr. A normal, reasonable person would be offended in the extreme by these disclosures and it is beyond the bounds of decency to attack Plaintiffs in this manner. Such disclosures serve no legitimate purpose—especially falsified as they are—and are made purely out of animosity and spite.

93.     Sabanosh has a particular hatred for Aline Byrnes, Tur's sister. She goes out of her way in the book to repeatedly claim that Christopher hated Aline. In truth, it was Aline and Sabanosh who did not get along.

94.     Sabanosh's examples supposedly illustrating why Chris hated his sister are false and defamatory. In particular, Sabanosh claims that at some point Tur and Aline attended a funeral (for Chris's uncle) together and that after the funeral Tur told Sabanosh he never wanted to see Aline again.

95.     In fact, Chris sat with Aline at the luncheon following the funeral and spoke to her the whole time. This was witnessed by many people. Chris told other family members that day, including Pam Tur, that he was glad he got to spend the time catching up with Aline. The accusation by Sabanosh that Chris and Aline had some sort of disagreement at the funeral is not true.

96.     Sabanosh claims in Chapter 2 that Plaintiffs refused to come visit them after they moved to Guantanamo Bay, and that Plaintiffs were not happy for them, again trying to paint a picture of horrible in-laws who went out of their way to make her life miserable. In reality, Plaintiffs were sad that they would not get to see close family because they were moving far way.  The plaintiffs wanted to visit but whenever the topic was broached Sabanosh told them it was easier for her family to come to the States given the red

Case ID: 220500433

tape of visiting. The Tur Family also offered to pay for Chris and Lara's family to travel to Sedona for a family vacation with everyone, but they refused.

97.    In addition, plaintiff Ann Marie Tur did visit Chris and Lara at least three times in Cuba, and the others were often in contact with Christopher and the children. This statement is therefore false and defamatory.

98.    At every point, innocent interactions are portrayed as nefarious, they are embellished, and false facts are added to negatively and falsely portray Plaintiffs as evil, petty, hateful, and vindictive.

99.    Sabanosh also tries to falsely paint a picture that Plaintiffs knew that Chris was abusive or unhinged. Sabanosh describes an alleged incident where Chris allegedly wanted to go to Las Vegas and did not care about family finances or how much he spent.[4] Sabanosh claims that "His mother overheard our conversation" and that Chris was throwing a "tantrum." Sabanosh writes:

> "Chris," his mom interrupted. "I don't think it's appropriate to go to Vegas right now."
> "(Explicative) off!)" he roared at her.
> HIs mom screamed back at him, causing him to storm off to the bedroom in which were staying.
> "That's kinds how he's been," I offered in some attempt to explain, though I knew there was no justification.
> "Wow," she replied.

Caged, at p.134.

100.    This exchange never happened. Ann Marie was never aware that Chris wanted to go to Vegas (if that was even true). It is defamatory to accuse Ann Marie of getting in a screaming argument with her son, and even if true its disclosure is wildly inappropriate.

---

[4] This is part of a pattern of Sabanosh projecting her own flaws on others. Sabanosh has expensive habits and tastes; the Tur family even had to pay some of the couple's bills as a result.

Case ID: 220500433

### Sabanosh Lies about how Christopher Tur's
### Mother Learned about His Death

101.      Sabanosh's book tells a baffling series of lies about how the Tur family found out about

Christopher going missing and dying.

102.      She claims on Page 134 that she called Ann Marie Tur to tell her that Chris was missing.

This never happened. The family had no idea he was even missing until they learned he was dead.

103.      The description by Sabanosh of the alleged phone call to Ann Marie Tur to tell her Chris

was missing—which never happened—is extremely defamatory.

104.      Sabanosh writes:

> As I call Chris's mom, I feel emotionally exhausted. I explain the basics: He was drunk last
> night. He ran off. We can't find him. As she listens, she becomes frustrated. I know she's
> thinking about the last time she saw him in August. The weekend he wanted to go to Las
> Vegas while we were stateside, dropping Savannah off at college for the first time—the
> time she took my side. I'm sure his f-word-loaded retort is ringing in her ears. She has
> seen his aggression. She is not surprised by anything I say, either.

Caged, at p.134.

105.      None of this occurred, not the call about Chris being missing, nor the Vegas argument.

Ann Marie Tur never took Sabanosh's side, never saw aggression from Chris, and never had an "f-word-

loaded retort ringing in her ears." The claim that Ann Marie was not surprised by Chris going missing is

also utterly false.

106.      The shamelessness it takes to concoct these stories and publish them, not even

understanding how fake and self-serving they sound, boggles the mind.

107.      Even if any of the foregoing had occurred, how dare Sabanosh publish what would have

been one of the most private and traumatic moments of Ann Marie Tur's life and have the temerity to

publish what thoughts she believed were in Ann Marie's head.

108.      Sabanosh's book then claims that she made the phone call to Ann Marie Tur, Chris's

mother, to tell her that her son was dead. Caged, at p.140. Sabanosh is lying; she did not call Ann Marie

Tur and did not tell Ann Marie that Chris was dead.

Case ID: 220500433

109.     Even if she had, it is highly offensive for Sabanosh to publicly write about and disclose Ann Marie's reaction to such a traumatic and private moment.

110.     What actually happened is that Sabanosh left a voicemail for Pam Tur asking for a call back. Pam could not reach Sabanosh, so she called Savannah, but Savannah was understandably distraught and not able to speak. Defendant Amy Ripp Coyne was present and took the phone and told Pam and Mike what had happened. At this point, Mike and Pam called Hank and Sandy, and Hank and Sandy drove to Ann Marie Tur's house and told her in person that Chris was dead.

111.     Ann Marie had no inkling there was a problem with Chris until Hank and Sandy told her that Chris had died. Defendant Ripp Coyne knew this.

112.     It is devastating to the Plaintiffs to see Defendants publicly expose, in a manifestly false light, how their family privately coped with the death of a loved one. There is no justification for this.

## Defamatory Statements about Plaintiffs in Pennsylvania

113.     As noted, the Tur family welcomed Lara and her daughters into their homes in Pennsylvania immediately following Chris's death.

114.     After it was broadcast on the news on January 21, 2015, that Sabanosh had an affair with Nettleton, she claims that plaintiff Mike Tur came up to her in his kitchen the next day "towering over me." She says that Mike Tur said "I think it would be best if you and Madison found somewhere else to stay." Caged, at p.161. Sabanosh then claims she said "Okay" because she felt "unsafe" in the house because "his family hasn't been supportive, nor willing to see reality or hear the truth about Chris." Id.

115.     This is a common theme, Sabanosh baselessly claiming throughout the book that she is somehow unsafe in the presence of the Turs to impugn them.

Case ID: 220500433

116.    The claim about Mike Tur is false and defamatory. Mike never spoke to Sabanosh herself about her leaving and did not confront or "tower" over her in the kitchen.

117.    Sabanosh, however, after the news reports was panicking, was out of control, and was attempting to excuse her own conduct and attack Chris Tur in front of his grieving family. Her book admits this when she writes that the family did not want to "hear the truth about Chris." Id.

118.    Indeed, the impression that Sabanosh gave is that she wanted everyone to stop grieving, stop asking so many questions, and move on. In hindsight, it is clear she did not want extra attention being paid to her given her and her lover's role in what happened.

119.    She was also taking surreptitious phone calls from Nettleton and absurdly bragging to the Tur family about how Sabanosh and Nettleton were going to end up together. Remember, the Turs had opened their homes to Sabanosh to comfort her, and in return were subjected to Sabanosh attempting to justify Chris's death and excuse her own outrageous actions (including hiding the affair that led to his death).

120.    It was a horrifying and embarrassing spectacle, especially as she apparently expected pity, sympathy, and the Tur family to support her.

121.    Mike Tur therefore approached her father Alan Sabanosh; it was not a contentious conversation. Mike made the obvious point that Lara staying at the house was not working out; her presence was causing division. One of Mike and Pam's sons refused to stay in the house with Lara so he left to stay with Ann Marie. Mike asked Alan Sabanosh to get Lara under control. Alan responded "I've never been able to control her" indicating that he too could

Case ID: 220500433

see that her behavior had crossed lines. Given the circumstances, Mike told Alan that it would be best if Lara left and Alan agreed to tell Lara. The children were not asked to leave nor referenced.

122.     Note that the Tur family just found out that Sabanosh had an affair, cheated on their dead son and brother, and she was bragging about how her and her adulterous lover were going to end up together. Sabanosh incredibly believes that they should have felt sorry for her.

123.     Shortly after Sabanosh moved to a hotel, one of the daughters had a 15th birthday party. All Plaintiffs attended to show support despite Sabanosh's behavior; the child was blameless. Defendant Ripp Coyne was also present with a guest.

124.     Sabanosh chose a relatively expensive restaurant. The book falsely claims the bill was $1,300 and that "no one, except my parents, offered to pay for the large group meal. There are over a dozen of us there!" Caged, at p.164. She writes that she refused her parents' offer and that Plaintiffs alleged frugalness made her concerned about her and kids' future financial situation. Id.

125.     This, too, is false and defamatory. In fact, after the bill came Michael and Hank approached Sabanosh and offered to split the bill for the dinner, which Sabanosh declined. There are multiple witnesses. Again, Sabanosh's book tells the story of a fictional alternate reality which has no basis in the truth.

126.     Sabanosh's attempt to claim this dinner jeopardized her family's financial situation (which she refused help paying for) is also not sincere. At that same party, in front of the entire family, Sabanosh gave her daughter an expensive vacation to Disney World she said Chris and her had preplanned. Sabanosh tastelessly said in front of the Tur family "Because your

Case ID: 220500433

dad isn't here to go with you, Savannah is going to go with you instead." If Sabanosh was *that*

worried about money, a vacation like this was an unnecessary expense.

127.    Sabanosh is twisting the truth and reality to attack Plaintiffs.

### Sabanosh Egregiously Defames Hank and Michael Tur Regarding their Brother's Ashes

128.    Sabanosh and the book then moves on to another topic: what was going to be done

with Chris's ashes. She writes that, "Hank and Sandy come to the hotel and ask me to sign a

document they printed from their computer. They tell me it would help out with the funeral

logistics, saying they couldn't do anything about the funeral home without it. I believe them and

sign the paper." Caged, at p.163

129.    Sabanosh later states that "Chris's family had taken them [the ashes],

unauthorized, from the funeral home." Id. at p.164.

130.    Sabanosh is painting the false picture that the Tur family (Plaintiffs) fraudulently

induced her to unwittingly sign a document renouncing her claim to the ashes and giving Ann

Marie Tur the right to Chris's ashes, and that the Tur family then illegally took the ashes in

violation of the law.

131.    Every part of this narrative is false and defamatory.

132.    Lara, Mike, and Ann Marie had come ***to a prior verbal agreement*** that Ann Marie

Tur, not Lara, would receive the ashes so that Christopher could be buried next to his father.

133.    Hank and Sandy then brought a short document memorializing this agreement to

the hotel Sabanosh was staying at with her parents. Lara, her mother, and her father were all

present. ***They all read the document***, and witnessed the signing of the document. Lara's mother

Case ID: 220500433

even formally signed the document as a witness. It took around 15 minutes. Again, this was merely memorializing the prior verbal agreement that Ann Marie would receive the ashes. The claim that Sabanosh did not know what the document said or what she was signing is completely absurd.

134.    It is defamatory to claim that Hank Tur or any other member of the Tur family fraudulently misrepresented the contents of a document to Lara and that she did not know what she was signing. It is false to claim that Plaintiffs, specifically Mike Tur, did not have authorization to pick up the ashes from the funeral home.

135.    Sabanosh then later reversed course and claimed she wanted the ashes—even though she apparently thought Chris was a monster—and tried to revoke the document she signed and her mother witnessed. Legal filings and talks occurred. The matter was quickly settled, and 10% of the ashes were to be given to Chris's children.

136.    The signing of the settlement took place the morning of the funeral at the funeral home. Michael and Pam were present, as was Sabanosh, her father, and Savannah. After the signing, everyone walked out to the parking lot of the funeral home.

137.    The book includes egregiously false and outrageous accusations concerning what happened at the funeral home.

138.    Sabanosh claims that "Even the funeral director is repulsed by this display, disgusted by what the Tur family is doing my girls and me." Caged, at p.167. Sabanosh claims he said, "'I'm so sorry about all this,' he says to my dad and me." Id.

139.    This is false and defamatory. The funeral director never said those words either explicitly or in some other form.  Furthermore, the funeral director is on good terms with the Tur

Case ID: 220500433

family, always has been, and never was "repulsed" or "disgusted" by the Turs as described by Sabanosh. This is invented and fabricated. Note that the funeral director was in the funeral home the entire time and did not come out to the parking lot.

140.    Sabanosh then writes that as everyone was getting in their cars Mike and Pam Tur said "We want to talk to Savannah."

141.    Sabanosh continues, "[Savannah] shakes her head, and they [Mike] grab her. Savannah is trying to hold the ashes and get into my dad's car as she shakes herself loose." She goes on "As Mike puts his hands on my daughter, it sets off a fire in me. 'Get your hands off my child,' I yell." Caged, at p.167.

142.    This is utterly outrageous, false, and it is beyond all decency to claim plaintiff Mike Tur or his wife ever put hands on or assaulted their niece. This is poorly written fiction that never happened and was made up out of whole cloth.

143.    Mike Tur never even said a word to his niece in the parking lot, much less touched or grabbed her.

144.    What actually happened is that Pam Tur told her niece, Savannah, that she loved her as everyone was getting in their cars. Savannah and Pam Tur had been very close since Savannah went to college nearby; Savannah practically lived at Pam's home.

145.    Sabanosh went ballistic and said "Get the fuck away from my daughter, shut the hell up, you are not permitted to speak to her."

146.    Savannah then said that the Turs were not respecting her dad because he believed in "no man left behind" and the Turs were leaving her mother (Lara) behind. (Savannah was in a difficult position and Plaintiffs place no blame on her; but it goes without saying that Sabanosh's

Case ID: 220500433

conduct in cheating on Chris, hiding the affair, then telling his grieving family she was going to marry her adulterous lover was beyond the pale.)

147.    Pam then got in the car and told Savannah that they would always be there for her and would never stop loving her. At this point, Lara's dad who was in the driver's seat drove away.

148.    At no point did Mike Tur (or anyone else) touch or attempt to touch Savannah in any manner. This is a fabrication and is highly offensive. At no point did Mike Tur even speak to Savannah in the parking lot.

149.    Following the exchange of the ashes, Sabanosh's book continues to try to falsely paint the Tur family as monsters. For instance, she writes that a college attended by Savannah allegedly told Sabanosh that the Tur family had repeatedly contacted the school looking for Savannah, and that Savannah therefore decided not to go back to school because "[s]he doesn't think it's safe," and "she's tired of being hassled by her dad's family."

150.    No Plaintiff has any knowledge of any such contact; it is alleged that these contacts never happened. This accusation is false and defamatory and the reader would understand that Sabanosh was claiming that Plaintiffs allegedly harassed their granddaughter/ niece at her school, when they did not.

151.    This is part of a concerted effort to falsely paint the Tur family as a threat to Lara and her children's safety, a lie with no factual basis whatsoever.

Case ID: 220500433

### Defamatory Statements about the Trial

152.     Sabanosh's book also contains incredible claims about the Nettleton criminal trial. She writes: "I request permission to remain distanced from the Turs. Madison, if needed at the trial, doesn't want to be cornered like Savanah had been in the past." Caged, at p.198. The nostrum that Savannah was "cornered" is a reference to the false and defamatory claim that Mike Tur grabbed Savannah outside the funeral home. This never happened and its reiteration here is also defamatory.

153.     Sabanosh continues "The prosecution, the investigators, my legal team, and my parents all agree there are security concerns, and we are put up in a hotel away from the Tur family, the media, and everyone else. The agents assigned to protect me from the Tur family and any contact they try to make with me advise us to avoid the general area where the family is staying." Id. She also claimed that she was "flanked by my NCIS agent" in court. Id.

154.     This is all utterly and outrageously false and defamatory. None of this happened and it is twisting reality beyond recognition.

155.     **First,** *all witnesses and interested parties* including the Turs were told up front not to have contact with anyone associated with the case and to avoid public areas. It is outrageous to twist a routine and blanket precaution taken in trials to sequester witnesses and use it to claim that the federal government saw the Tur family as a threat to her. This may have been Sabanosh's delusion, but it was not the assessment or conclusion of NCIS or DOJ.

156.     **Second,** no one in the federal government (either prosecutors or investigators) ever told her that there were any security concerns or threats to her by the Tur family or anyone else, nor was she placed in a "secure" location to protect her from the Tur Family. This is

Case ID: 220500433

fundamentally disconnected from reality. She was not treated any differently than any other witness or involved party, and given all the same warnings.

157.    **Third**, no agents were specifically assigned to protect Sabanosh any more than they were generally assisting all the witnesses and interested parties.

158.    **Fourth,** Sabanosh was not assigned an NCIS agent that was her specific agent, implying that she needed protection from the Turs. She did not have a security detail nor was she under any sort of special protection. This was the agent escorting witnesses to and from the courtroom.

159.    To claim these sorts of things, which have no basis in the truth and to which any number of federal agents and employees can debunk, is stunning.

160.    Sabanosh's book continues attacking the Tur family and defaming them.

161.    At the criminal trial, while walking off the stand, Sabanosh incredibly and maliciously gave the middle finger to the Tur family, who was sitting there hoping for any semblance of justice for the death of their son and brother. This was witnessed not only by Hank Tur, but at least one third party, Christopher Tur's boss Dave Imrie.

162.    After Sabanosh left the courtroom, Hank stated "she just shot us the finger." Aline turned around in disbelief and said "What?" Mr. Imrie confirmed to the rest of the astonished family that Sabanosh had indeed flipped off the familyin the middle of the courtroom.

163.    Clearly, Sabanosh is full of hatred and ill will for the Tur family—something her book amply confirms.

164.    In her book, Sabanosh addressed the fact that she gave the middle finger in court to the Tur family. Sabanosh falsely and absurdly asserts that she was just brushing her hair and

Case ID: 220500433

sweat on her face and that the Tur family is lying. The accusation that the Tur family lied about this incident is false and defamatory.

165.    In fact, as Hank and Mr. Imrie can confirm, Sabanosh gave the finger from waist level and any excuse about brushing her hair or forehead is yet another falsehood.

166.    This complaint is not intended nor should it be viewed as an exhaustive list of every falsehood written by Lara Sabanosh in the book.

167.    As a direct and proximate result of Defendants' negligence and/or gross negligence and/or carelessness and/or recklessness and/or maliciousness, Plaintiffs suffered serious harm as described through this complaint:

    a.    Mental anguish;
    b.    Emotional distress;
    c.    Sleeplessness, anxiety, humiliation
    d.    Reputational harm
    e.    Loss of privacy

*****

Case ID: 220500433

# PARTIES

**Plaintiff Michael Tur**

168.    Plaintiff Michael Tur is a resident and citizen of Pennsylvania.

169.    He is the brother of Christopher Tur.

**Plaintiff Henry P. Tur, Jr.**

170.    Plaintiff Henry "Hank" Tur, Jr. is a resident and citizen of Pennsylvania.

171.    He is the brother of Christopher Tur.

**Plaintiff Aline Byrnes**

172.    Plaintiff Aline Byrnes is a resident and citizen of Pennsylvania

173.    She is the sister of Christopher Tur.

**Plaintiff Ann Marie Tur**

174.    Plaintiff Ann Marie Tur is a resident and citizen of Pennsylvania.

175.    She is the mother of Christopher Tur.

**Defendant Lara Sabanosh**

176.    Lara Sabanosh, formerly known as Lara Tur, is a citizen and resident of Florida.

177.    Sabanosh authored, published, disseminated, and advertised the defamatory book "Caged."

**Defendant Morgan James Publishing, LLC**

178.    Morgan James Publishing is a book publisher incorporated in Virginia and headquartered in New York.

179.    It published and disseminated the defamatory book "Caged" by Lara Sabanosh by both electronic and print means.

Case ID: 220500433

180.    Morgan James knew or should have known that the explosive claims in Sabanosh's book evidenced a degree of personal animosity toward Christopher Tur, and his family members, which required verification and fact checking. This fact checking is required not only by the facts of the instant situation, but also by industry standards.

181.    On information and belief, it is alleged that defendant Morgan James knew or should have known about Sabanosh's academic fraud, which put Defendant on notice Sabanosh had credibility problems.

182.    Furthermore, Sabanosh admitted in the book itself to lying to law enforcement regarding her husband's killing; the book was written in part to attempt to whitewash and explain away her role in the scandal.

183.    Sabanosh had also acquired a great deal of infamy and notoriety that Defendant Morgan James would know about.

184.    All this put Defendant Morgan James on notice that the accusations made by Defendant Sabanosh in the book against private figures, Plaintiffs, should be verified.

185.    Defendant did not even attempt to do any such investigation, and breached its duty and all applicable industry standards.

186.    Defendant also knew or should have known that the book purported to publicize a great deal of a private issues about the Tur family—as noted above, much of it blatantly false—which had no legitimate purpose. Defendant undertook no examination or check to determine if this material should be published, as it was required to do.

**Defendant Amy Ripp Coyne**

Case ID: 220500433

187.    Defendant Amy Ripp Coyne is a resident and citizen of Schwenksville, Pennsylvania

188.    Ripp Coyne is Sabanosh's best friend and was present for many of the events described in this complaint. She knew Chris Tur was dead before Chris's own family, and in fact was the person who informed them the Turs that Chris had died.

189.    Sabanosh's book expresses "gratitude to those who have been undeniable pillars throughout my process, people such as Amy . . .".

190.    On information and belief, defendant Ripp Coyne reviewed, edited, provided input, and participated in drafting the book knowing and intending that it be published.

191.    Defendant Ripp Coyne knew that several incidents described in the book are false and/or that they disclose private facts which should never have been published, but she nevertheless participated in helping publish and publicly disclose them. This includes the false account of how the Tur family found out about Chris's death and Sabanosh's related defamatory accusations about Ann Marie Tur, and the false facts disseminated about the birthday dinner at the Japanese restaurant.

192.    After the book's publication, Ripp Coyne then participated in Sabanosh's promotional campaign on social media.

*****

Case ID: 220500433

# Jurisdiction & Venue

193.    Jurisdiction over the parties in the Courts of the Commonwealth of Pennsylvania is proper pursuant to the provisions of 42 Pa. C.S. § 5301-5308 *et seq*.

194.    Much of the conduct at issue in this lawsuit occurred in the Commonwealth of Pennsylvania where Plaintiffs live, Christopher Tur is from, and Sabanosh's parents previously lived.  Sabanosh was present in Pennsylvania for many of the events at issue.

195.    Defendant Ripp Coyne is a resident and citizen of Pennsylvania.

196.    Furthermore, Defendants deliberately directed the defamatory publication in both electronic and print forms to Pennsylvania, intended that Plaintiffs and people they know read it, and knew or should have known the Plaintiffs would suffer the harm there.

197.    Venue is proper in the Philadelphia County Court of Common Pleas under Pennsylvania law because the cause of action arose in part in Philadelphia County because the defamatory publication was received and read in Philadelphia, including by Frances Muhly in March 2022.

*****

Case ID: 220500433

## Count I:

## Libel

*All Plaintiffs*

*v.*

*All Defendants*

198.   Pursuant to Pa. R. Civ. P. 1019(g), all averments in the complaint are incorporated by reference as if fully set forth herein.

199.   Note that under Pennsylvania law, Plaintiffs have causes of action for the electronic publication and republications, and the paper publication, of the various versions and releases of the book. See Restatement (Second) of Torts section 577A; Graham v. Today's Spirit, 468 A. 2d 454 (Pa. 1983).

200.   The elements of libel are: 1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) an understanding by the reader or listener of its defamatory meaning; 5) an understanding by the reader or listener of an intent by the defendant that the statement refer to the plaintiff.

201.   A private figure need only show negligence on the part of Defendants.

202.   Plaintiffs are private figures, not public figures.

203.   Here, the complaint establishes many factually false statements which are incorporated here by reference. The factually false statements by Defendants about Plaintiffs are highly offensive on their own, and when viewed in totality, and bring Plaintiffs into disrepute and are defamatory.

204.   The defamatory statements were published and republished many times both in e-book form, in print, and via audio format. The defamatory statements explicitly apply to the

Case ID: 220500433

Plaintiffs, and the reader understands their defamatory meaning. The reader also understands that Defendants intend the statement to refer to the plaintiff.

205.    The book is an extraordinary, gratuitous, and malicious attack on Plaintiffs, full of falsehoods.

206.    Defendant Lara Sabanosh knowingly and maliciously invented these defamatory lies about Plaintiffs.

207.    As described above, Defendant Amy Ripp Coyne knew or should have known that that several of the false statements in the book were false.

208.    Defendant Morgan James Publishing's actions and omissions were not reasonable and breached the standard of care and industry standards in publishing this book and its defamatory statements. Its actions and omissions were negligent, grossly negligent, and/or reckless.

209.    Defendants' actions and omissions have directly and/or proximately caused severe mental and emotional harm to Plaintiffs. Their son was killed in a very public scandal, and they are now under public attack compounding their grief and anguish. The entire debacle has been unbelievably traumatic for Plaintiffs.

210.    Defendant Lara Sabanosh has deliberately targeted and taken aim at Plaintiffs, maliciously lying about them to create the impression that they are evil, vindictive, and are a threat to her and her family's safety.

211.    Sabanosh has also engaged in an extensive publicity campaign to promote the book, doing what is believed to be dozens of interviews, extensively compounding the damage.

Case ID: 220500433

Defendant Ripp Coyne has also participated in this publicity campaign with the intent of widely disseminating the book and its allegations and disclosures.

212.     As a direct and proximate result of Defendants' actions and omissions, Plaintiff sustained damages, including but not limited to mental and emotional distress and reputational harm.

213.     The behavior of Defendants warrants punitive damages because Defendants' conduct is outrageous, intentional, and/or demonstrates reckless disregard for the Plaintiffs' rights and lives.

*****

## Count II:

## Invasion of Privacy False Light

*All Plaintiffs*

*v.*

*All Defendants*

214.     Pursuant to Pa. R. Civ. P. 1019(g), all averments in the complaint are incorporated by reference as if fully set forth herein.

215.     The elements of false light are (1) giving publicity to a matter concerning plaintiff, (2) that places plaintiff before the public in a false light, (3) which would be highly offensive to a reasonable person.

216.     Here, Defendants gave publicity to matters concerning plaintiffs, namely their private life and relationships, by way of publishing a book and promoting that book.

217.     The publicity that Defendants gave to those matters concerning Plaintiffs placed Plaintiffs in a false light for the reasons described throughout this complaint, including depicting

Case ID: 220500433

Plaintiffs as evil, vindictive, callous, insensitive, and a safety threat to Defendant Sabanosh and her family.

218.     The false light in which Defendants have placed Plaintiffs is highly offensive to a reasonable person as described throughout this complaint.

219.     As a direct and proximate result of Defendants' actions and omissions, Plaintiffs sustained damages, including but not limited to mental and emotional distress and reputational harm

220.     The behavior of Defendants warrants punitive damages because Defendants' conduct is outrageous, intentional, and/or demonstrates reckless disregard for the Plaintiffs' rights and lives.

*****

## Count III:

## Invasion of Privacy Intrusion Upon Seclusion

*All Plaintiffs*

*v.*

*All Defendants*

221.     Pursuant to Pa. R. Civ. P. 1019(g), all averments in the complaint are incorporated by reference as if fully set forth herein.

222.     The elements of intrusion upon seclusion are (1) an intrusion into a private seclusion that the plaintiff has thrown about his person or affairs, (2) the interference with the plaintiff's seclusion is substantial, and (3) the interference would be highly offensive to the ordinary reasonable person.

Case ID: 220500433

223.     Plaintiffs have not sought to publicize their personal life or their family relationships. In fact, they value their privacy.

224.     Defendants, as described throughout this complaint, published a book which not only defames Plaintiffs and places them in a false light, but purports to expose every aspect of the Tur family's private matters, finances, personal disputes, familial disputes, and familial relationships.

225.     Sabanosh had access to the Turs because she was their in-law for many years, and Ripp Coyne had access because she was Sabanosh's friend.

226.     The publishing of a book taking very public aim at the Tur family, and a large number of promotional appearances, is substantial as a matter of law, as is the nature of the disclosed content.

227.     The intrusion by Defendants is offensive in the extreme. Defendants have published a book trying to profit off Sabanosh's husband's death, at the hands of her lover, and have gratuitously included dozens of personal attacks on Plaintiffs concerning incredibly private matters.

228.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered severe emotional and mental distress, harm to their reputation, and loss of privacy.

229.     The behavior of Defendants warrants punitive damages because Defendants' conduct is outrageous, intentional, and/or demonstrates reckless disregard for the Plaintiffs' rights and lives.

*****

Case ID: 220500433

Count IV:

Invasion of Privacy Public Disclosure of Private Facts

*All Plaintiffs*

*v.*

*All Defendants*

230.    Pursuant to Pa. R. Civ. P. 1019(g), all averments in the complaint are incorporated by reference as if fully set forth herein.

231.    The elements of public disclosure of private facts are (1) publicity, (2) given to private facts, (3) which would be highly offensive to a reasonable person, (4) not of a legitimate concern to the public.

232.    Defendants acquired private facts about Plaintiffs in the course of Sabanosh being married to their relative Christopher Tur.

233.    Defendants published a book which extensively purports to disclose private facts—many of which are distorted, twisted, and false—about Plaintiffs, and engaged in a publicity campaign to promote the book.

234.    Defendants' disclosure is highly offensive to a reasonable person. Defendants have purported to expose the Turs' personal and familial issues, finances, and disclose alleged private conversations Sabanosh had with Plaintiffs, all for the purpose of profiting off the death of her husband at the hands of her husband. She even attempts to disclose and impugn the private thoughts and conduct of Plaintiffs concerning their dying husband/father, Henry Sr.

235.    The inclusion of the Tur family in the book is utterly gratuitous, not related to any public concern, and has no legitimate public interest. Sabanosh has personal hatred for and a vendetta against the Tur family and her attacks are related to her personal hatred, not any

Case ID: 220500433

legitimate public issue.

236.   Note that Sabanosh claims her husband Chris Tur was abusive, in an attempt to exploit the MeToo movement. Plaintiffs do not believe this for a second given the man they knew and Sabanosh's predilection for dishonesty; but the attacks on the Tur family and disclosure of private facts have no bearing on this topic, even if it is construed as a public concern.

237.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered severe emotional and mental distress, harm to their reputation, and loss of privacy.

238.   The behavior of Defendants warrants punitive damages because Defendants' conduct is outrageous, intentional, and/or demonstrates reckless disregard for the Plaintiffs' rights and lives.

*****

## COUNT V:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*All Plaintiffs*

*v.*

*All Defendants*

239.   Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

240.   As set forth herein, Defendants engaged in extreme and outrageous conduct by publishing outrageous lies about Plaintiffs, maliciously compounding and magnifying their grief over the death of their son/brother Christopher Tur.

241.   The book, and publicity tour, takes direct aim at Plaintiffs and is an unprecedented attack on them personally, motivated by personal greed.

Case ID: 220500433

242.     It also inappropriately hijacks the MeToo movement, dishonestly trying to portray Defendant Sabanosh as the victim in this sordid affair.

243.     Defendants' conduct directly and proximately caused Plaintiffs to suffer extreme emotional distress, including mental and emotional anguish, sleeplessness, anxiety, humiliation, and loss of reputation.

244.     The behavior of Defendants warrants punitive damages because Defendants' conduct is outrageous, intentional, and/or demonstrates reckless disregard for the Plaintiffs' rights and lives.

*****

Case ID: 220500433

# Relief Requested

Wherefore, Plaintiffs demand judgment in its favor and against Defendants, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiffs a jury trial, exclusive of interests and costs, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

a. Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including but not limited to mental anguish, emotional pain and suffering, embarrassment, humiliation, reputational harm, and invasion of privacy;

b. Punitive and exemplary damages.

c. Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

*****

Francis Alexander, LLC
*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.: 208494
Alfred Joseph (AJ) Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*Law Firm / Lawyers for Plaintiff*
*/d/ September 9, 2022*

Case ID: 220500433

## Spoliation Notice -- Preservation of Evidence

Plaintiffs hereby demands and requests that Defendants take necessary actions to ensure the preservation of all documents, records, social media, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint. This includes any and all communications related to the drafting, editing, publishing, and promotion of the book Caged.

Failure to preserve discoverable material may result in the imposition of severe sanctions.

Case ID: 220500433

# Jury Trial Demand

Plaintiffs hereby demands a 12-person jury trial.

*****

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Attorney ID No.: 208494
Alfred Joseph (AJ) Fluehr, Esquire
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*Law Firm / Lawyers for Plaintiffs*

*/d/ September 9, 2022*

Case ID: 220500433

# VERIFICATION

I, MICHAEL TUR, hereby verify that the facts set forth herein are true and correct to the best of my knowledge, information, and belief. I further understand that the statements herein are made subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

SIGN:  */s/ Michael Tur*

Michael Tur

DATE:  */d/ September 9, 2022*

Case ID: 220500433

# Certificate of Service

I hereby state that a true and correct copy of the foregoing Complaint Civil

Action is being filed with the Court of record and thereafter being served to the Defendants

listed below in accordance with the Pennsylvania Rules:

Lara Sabanosh
9741 Quail Hollow Blvd.
Pensacola, FL 32514
T: (904) 302-4877
E: lmsabanosh@gmail.com

Morgan James Publishing, LLC
C/O Raymond H. Suttle, Jr., Esq.
701 Town Center Drive, Suite 800
Newport News, VA 23606

Amy Ripp Coyne
67 Ashley Drive
Schwenksville, PA 19473

*****
*Respectfully submitted,*
Francis Alexander, LLC
*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*Law Firm / Lawyer for Plaintiffs*
*/d/   September 9, 2022*

Case ID: 220500433